IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COLIN GRAHAM MEGLITSCH,<br><br>                           Plaintiff,<br><br>   vs.<br><br>SOUTHCENTRAL FOUNDATION,<br><br>                           Defendant. | No. 3:20-cv-0190-HRH |

O R D E R

Motion for Summary Judgment

Defendant Southcentral Foundation moves for summary judgment.[1] This motion is opposed by plaintiff Colin Graham Meglitsch.[2] Oral argument was not requested and is not deemed necessary.

Facts

Defendant is a Tribal organization under Title V of the Indian Self-Determination and Education Assistance Act (ISDEAA). A Tribal organization under the ISDEAA includes

---

[1]Docket No. 22.

[2]Docket No. 29.

"any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body...." 25 U.S.C. § 5304(*l*). Defendant has been designated by the Cook Inlet Region, Inc. (CIRI) and eleven federally recognized tribes, including the Takotna Village, to carry out federal health care programs for Alaska Natives and Native Americans. Defendant receives the federal funds that CIRI and the tribes would receive directly if they had chosen to operate their own health care programs. Defendant "is a Co-Signer to the Alaska Tribal Health Compact ('ATHC'), which is an agreement between 25 Alaska tribal entities and the Secretary of the DHHS. Under the ATHC, [defendant] and the 24 other Co-Signers of the ATHC operate federal health and health-related programs for the benefit of Alaska Natives" and Native Americans.[3] Defendant "provides medical, dental, behavioral health, and substance abuse treatment services to over 73,000 Alaska Native and [Native American] people living within the Municipality of Anchorage, the Matanuska-Susitna Borough, and 55 rural villages across Alaska[.]"[4]

Plaintiff is employed as a Community Health Aide at defendant's health clinic in Takotna, Alaska. Plaintiff has worked as a Community Health Aide in Takotna for more than ten years and lives in housing provided by defendant. The Community Health Aide

---

[3]Declaration of Lisa C. Mock in Support of SCF's Motion for Summary Judgment at 3, ¶ 8, Docket No. 23.

[4]Declaration of Ronald Lee Olson in Support of SCF's Motion for Summary Judgment at 2, ¶ 3, Docket No. 24.

-2-

position "is a non-professional position."[5]  Plaintiff's position "is categorized as full-time, non-exempt" and plaintiff was informed that "non exempt employees are eligible for overtime."[6]

According to plaintiff's complaint, "[i]n addition to his normal, on-site duties, [defendant] required [him] to assume duties that it termed as 'on-call duties.' These 'on-call duties consisted of [him] answering any after-hours calls directed to [the] Takotna Clinic."[7] "These after-hour emergency calls were directed to a phone number accessible at only two land line phones, one located in the Takotna Clinic, and the other located" in plaintiff's residence.[8] Plaintiff contends that for the "on-call" hours he worked, he was paid "$4.00 per hour during the time that he had responsibility for the after-hours emergency phone" and "was paid one and half his regular rate of pay for hours when he actually needed to make an emergency response to a call to the after-hours emergency number."[9] This is consistent with defendant's "Hours of Work, Compensable Wages, and Paydays Procedure" (referred to

---

[5] Declaration of Natalie Michelle Tierney in Support of SCF's Motion for Summary Judgment at 2, ¶ 4, Docket No. 25.

[6] Plaintiff's 2013 Employment Letter, Exhibit A at 1, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Docket No. 29.

[7] Complaint at 2, ¶ 2.3, Exhibit A, Notice of Removal, Docket No. 1.

[8] Id.

[9] Id. at 2, ¶ 2.4.

-3-

herein as "defendant's pay policies").[10] Defendant's pay policies provide that the on-call rate of pay is 15% percent of an employee's base pay with a cap of $4.00 per hour and that "[o]n-call hours are not considered actual hours worked for computation of overtime."[11] Defendant's pay policies also provide that "[w]hen an employee is called into work while on an on-call status, the employee will be considered in a call-back status" and that "[c]all-back pay will be paid at a rate of one and a half (1.5) times the employee's hourly rate and for a minimum of two (2) hours."[12]

Plaintiff alleges that since 2012, he has been the sole employee "authorized to answer the emergency phone line...."[13] Plaintiff alleges that "[d]uring the last three years of his employment with" defendant, he "worked over 15,000 hours of on-call responsibilities, for which he only received $4.00 per hour, rather than one and one half his normal rate, as is required under Federal Wage and Hour law."[14]

On June 1, 2020, plaintiff commenced this action with the filing of a complaint in state court. Defendant removed the action to this court on August 5, 2020. In his complaint, plaintiff asserts a single cause of action, alleging that defendant violated the Fair Labor

---

[10]Exhibit B, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Docket No. 29.

[11]Id. at 5-6.

[12]Id. at 6.

[13]Complaint at 3, ¶ 2.6, Exhibit A, Notice of Removal, Docket No. 1.

[14]Id. at 3, ¶ 2.9.

Standards Act ("FLSA") by failing to properly pay him overtime for the on-call hours he worked.

Defendant now moves for summary judgment on the grounds that the court lacks subject matter jurisdiction because the FLSA does not apply to defendant.

Discussion

As an initial matter, plaintiff argues that the court should treat the instant motion as a Rule 12(b)(1) motion to dismiss, rather than a summary judgment motion, because defendant is challenging the court's subject matter jurisdiction. The court, however, cannot treat the instant motion as a Rule 12(b)(1) motion because such motions must be filed prior to any responsive pleading. Aetna Life Ins. Co. v. Alla Medical Services, Inc., 855 F.2d 1470, 1474 (9th Cir. 1988). Defendant filed its answer on August 12, 2020.[15] It did not file the instant motion until June 6, 2022.

The court also cannot treat the instant motion as a motion for summary judgment even though defendant has labeled the motion as such. Were the court to treat the instant motion as a motion for summary judgment and grant said motion, that would be a decision on the merits. Singh v. American Honda Finance Corp., 925 F.3d 1053, 1071 (9th Cir. 2019). But, if the court lacks subject matter jurisdiction, it may not decide a case on the merits. See Medina v. U.S. Dep't of Homeland Security, 408 F.Supp.3d 1224, 1236 (W.D. Wash. 2019) ("[w]hen a court lacks subject matter jurisdiction, it lacks the power to proceed, and its only

---

[15]Docket No. 4.

remaining function is to dismiss"). Rather, the court must treat the instant motion as a Rule 12(h)(3) motion. "Federal Rule of Civil Procedure 12(h)(3) provides that '[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.'" Hamidi v. Service Employees Int'l Union Local 1000, 386 F.Supp.3d 1289, 1294 (E.D. Cal. 2019) (quoting Fed. R. Civ. P. 12(h)(3)). "The difference between a Rule 12(h)(3) motion and a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) 'is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party.'" Id. (quoting Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 880 n.3 (3d Cir. 1992)). Thus, "[t]he same standards that govern a Rule 12(b)(1) motion apply to a Rule 12(h)(3) motion." Estate of Elkins v. Pelayo, Case No. 1:13-CV-1483 AWI SAB, 2020 WL 2571387, at *1 (E.D. Cal. May 21, 2020).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Circ. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Id. Here, defendant is making a factual challenge as it has offered declarations and other evidence in support of its motion. "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." Id. "The court need not presume the truthfulness of the

plaintiff's allegations." Id. "'Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.'" Id. (quoting Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).

The sole issue here is whether the FLSA applies to defendant. "The FLSA is a statute of general applicability[,]" and "[s]uch generally applicable statutes typically apply to Indian tribes." Snyder v. Navajo Nation, 382 F.3d 892, 894–95 (9th Cir. 2004).

> There are, however, three exceptions to this principle. A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law "touches exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservation...."

Donovan v. Coeur d'Alene Tribal Farm, 751 F.2d 1113, 1116 (9th Cir. 1985) (quoting United States v. Farris, 624 F.2d 890, 893 (9th Cir. 1980)). This case involves the first exception, whether "the law 'touches exclusive rights of self-governance in purely intramural matters[.]'" Id. (quoting Farris, 624 F.2d at 893). This exception applies "only in those rare circumstances where the immediate ramifications of the conduct are felt primarily within the reservation by members of the tribe and where self-government is clearly implicated." Snyder, 382 F.3d at 895. The goal of the self-governance exception is not to "bring within

the embrace of 'tribal self-government' all tribal business and commercial activity." Coeur d'Alene, 751 F.2d. at 1116. Rather, the self-governance exception "is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes." Id. "[T]o put it another way, 'Indian tribes retain exclusive jurisdiction over essential matters of reservation government, in the absence of specific Congressional limitation.'" Farris, 624 F.2d at 893 (quoting Ariz. ex rel. Merrill v. Turtle, 413 F.2d 683, 684 (9th Cir. 1969)). "Whether a federal statute applies to Indians is a question of law...." United States v. Baker, 63 F.3d 1478, 1484 (9th Cir. 1995).

Although defendant is not a Tribe, the parties agree that because defendant is a Tribal organization, a Coeur d'Alene exception might apply to it. The parties disagree as to whether the self-governance exception does apply to defendant. Defendant argues that it does apply; plaintiff argues that it does not.

Defendant is engaged in the non-commercial, not-for-profit provision of health care services on behalf of CIRI and the eleven authorizing tribes. And, as this court has previously found "[p]roviding health care is a core governmental function of Alaska tribes[.]" Matyascik v. Arctic Slope Native Ass'n, Ltd., Case No. 2:19-cv-0002-HRH, 2019 WL 3554687, at *2 (D. Alaska Aug. 5, 2019) (citation omitted). In applying the self-governance exception, the Ninth Circuit has "been particularly careful to distinguish tribal enterprises from tribal entities engaging in self-government." Pauma v. National Labor

Relations Board, 888 F.3d 1066, 1076 (9th Cir. 2018). When defendant provides health care services to Alaska Natives and Native Americans, it is engaged in self-governance; it is not simply operating as a tribal enterprise.

Of some import is the fact that defendant receives funding under the ISDEAA. In E.E.O.C. v. Karuk Tribe Housing Authority, 260 F.3d 1071, 1080 (9th Cir. 2001), the court held "that the ADEA does not apply to Grant's employment relationship with the Karuk Tribe Housing Authority because it touches on 'purely internal matters' related to the tribe's self-governance." In reaching this holding, the court placed some significance on the fact that "the federal law that provides funds for the Housing Authority specifies that such funds 'should be provided in a manner that recognizes the right of Indian self-determination and tribal self-governance[.]'" Id. (quoting 25 U.S.C. § 4101). Similarly here, the ISDEAA recognizes "'the right of Indian self-determination and tribal self-governance[.]'" Id. (quoting 25 U.S.C. § 4101). As the notes to the ISDEAA provide, Congress found "that transferring full control and funding to tribal governments, upon tribal request, over decision making for Federal programs, services, functions, and activities[,]" such as the provision of health care normally provided by the Indian Health Service ("IHS"), was "an appropriate and effective means of implementing the Federal policy of government-to-government relations with Indian tribes; and ... strengthens the Federal policy of Indian self-determination." 25 U.S.C. § 5381 (Notes).

Plainly, defendant's provision of health care services involves "'exclusive rights of self-governance[.]'" Coeur d'Alene Tribal Farm, 751 F.2d at 1116 (quoting Farris, 624 F.2d at 893). It also involves a "'purely intramural matter[.]'" Id. (quoting Farris, 624 F.2d at 893). Staffing and pay scales are purely intramural activities. Rates of pay have to do with defendant's internal operations. Plaintiff's arguments to the contrary fail.

Plaintiff argues that this is not a purely intramural matter because he is not a member of one of the authorizing tribes. But, this fact is irrelevant. A similar argument was made, and rejected, in Snyder, 382 F.3d 892. There, "law enforcement officers of the Navajo Nation Division of Public Safety ('DPS') ... filed actions against both the Navajo Nation and the United States claiming violations of the Fair Labor Standards Act[.]" Id. at 894. The court found that "maintain[ing] law and order within the reservation ... is a traditional governmental function[,]" and concluded that "[t]ribal law enforcement clearly is a part of tribal government and is for that reason an appropriate activity to exempt as intramural." Id. at 895. The court rejected an argument that the self-governance exception did not apply because some of the officers were non-Navajo. Id. at 896. The court explained that "the non-Navajo officers represent fewer than four percent of those employed by the Navajo DPS. The rest are tribal members. More important, all the officers work on the reservation to serve the interests of the tribe and reservation governance." Id. Thus, the court held that the FLSA did not apply to the "Navajo Nation's DPS[.]" Id.

-10-

Here too, a majority of defendant's non-professional employees, of which plaintiff is one, are Alaska Native or Native American. Specifically, "[a]s of May 2022, 93.7% of [defendant's] clerical and non-professional employees[,]" were Alaska Native or Native American.[16] And, more important, plaintiff and all of defendant's other employees are working to serve the interests of the authorizing tribes and their self-governance.

Plaintiff also argues that this is not a purely intramural matter because defendant provides health care services to non-Alaska Natives and non-Native Americans. But, this fact does not mean that defendant's pay schemes are not an intramural matter. First of all, defendant primarily serves Alaska Natives and Native Americans. "Roughly 90% of the volume of patient services that [defendant] provides are to Alaska Native[s]" and "[a]pproximately 70% of [defendant's] patients are either Alaska Native" or Native American.[17] More specifically, "in calendar years 2017 through 2019, [defendant] had a total of 845,649 patient encounters. Of those patient encounters, 94.7% (800,934) were for Alaska Native and [Native American] patients. Only 5.3% (44,715) were for non-Alaska Native" or non-Native American "patients."[18]

---

[16]Southcentral Foundation's Responses to Plaintiff's Discovery Requests Dated July 29, 2022 at 10-11, Exhibit A, Declaration of Karen M. McIntire in Support of SCF's Summary Judgment Reply, Docket No. 34.

[17]Olson Declaration at 2, ¶ 4, Docket No. 24.

[18]Southcentral Foundation's Responses to Plaintiff's Discovery Requests Dated July 29, 2022 at 9, Exhibit A, McIntire Declaration, Docket No. 34.

In addition, the health care services defendant provides to non-Alaska Natives and non-Native Americans are ultimately for the benefit of the tribal communities and persons with an interest and stake in tribal self-governance. Ronald Lee Olson, defendant's "Vice President of Finance and CFO[,]" explains that many of these non-Alaska Native and non-Native American patients are "women pregnant with Alaska Native or [Native American] children; ... individuals who live in Alaska Native communities served by SCF that have no other healthcare providers nearby," and defendant's employees.[19] Provision of health care to the first two plainly benefits the tribal communities and persons with an interest and stake in tribal self-governance. As for the provision of health care to defendant's employees, providing such health care

> reduces the financial costs of providing an employee healthcare plan thereby making funds available to enhance services to IHS beneficiaries ... and substantially enhances the confidence of IHS beneficiaries in the care they receive by demonstrating that SCF and ANTHC employees trust in and rely upon the quality of the services offered by SCF and ANTHC[.[20]]

This case is quite different from N.L.R.B. v. Chapa De Indian Health Program, Inc., 316 F.3d 995, 997 (9th Cir. 2003), which also involved an ISDEAA Tribal organization, namely Chapa-De. Chapa-De was "authorized under a sanctioning resolution made by the Rumsey Indian Rancheria, a federally recognized tribe, to contract with the IHS on behalf of the Rumsey Tribe to provide free health services to qualifying Native Americans in a

---

[19] Olson Declaration at 1, ¶ 2; 3, ¶ 5, Docket No. 24.

[20] Resolution No. 10-10, Exhibit B at 2, McIntire Declaration, Docket No. 34.

-12-

four-county area in Northern California." Id. When the National Labor Relations Board served subpoenas on Chapa-De, "Chapa–De challenged the NLRB's jurisdiction," arguing that the National Labor Relations Act did not apply to it. Id. at 997-98. The court rejected Chapa-De's argument that the self-governance exception applied, in large part because its activities did not involve "a purely intramural matter." Id. at 1000. The court explained that

> Chapa–De is a non-profit California corporation that operates outpatient health care facilities on non-Indian land. Nearly half of its patients are non-Native American. At least half of its non-professional employees—those involved in this controversy—are non-Indian as well.

Id. In addition, the court observed that "neither Chapa–De's chief executive officer, nor any of its board members, is a Rumsey Indian Rancheria member."[21] Id. In contrast here, as discussed above, a majority of defendant's patients are Alaska Native or Native American, and a majority of its non-professional employees are Alaska Native or Native American.[22]

---

[21]All of defendant's board members are Alaska Natives, although not all of the board members may be members of the authorizing tribes. See https://www.south-centralfoundation.com/about-us/leadership (last visited November 15, 2022).

[22]Defendant argues that this case is distinguishable from Chapa-De for another reason. There, the court found that

> [w]hile [Chapa-De] contracts with IHS for the delivery of health services by virtue of a Rumsey sanctioning resolution, its funding comes from MediCal and third-party insurers as well as from IHS under the ISDA. Accordingly, even though the Rumsey Tribe may be able to revoke its sanctioning resolution and thereby terminate Chapa–De's ISDA funding, Chapa–De would still have resources available to operate. To this extent its viability is independent of the Rumsey Tribe.

(continued...)

-13-

Plaintiff's argument that defendant's provision of health care to non-Alaska Natives and non-Native Americans makes this a non-intramural matter is somewhat akin to an argument made, and rejected, in Snyder, 382 F.3d 892. There, the court rejected an argument that the officers' "activities [were] not intramural because they are not performed exclusively on the reservation." Id. at 895-96. The court explained that the officers' off-reservation travel did "not relate to any non-government purpose" or "provide primary benefits to persons with no interest or stake in tribal government. Indeed, none of the officers' official travel is aimed at benefitting any private organization or nonmember." Id. at 896. Similarly here, as discussed above, defendant's provision of health care to non-Alaska Natives and non-Native Americans does provide a benefit to persons with an "interest or stake in tribal government." Id.

Plaintiff also points out that in Pauma, the court observed that "Casino Pauma is much like the tribe-owned farm in Coeur d'Alene--a business that 'employs non-Indians as well

---

²²(...continued)
Chapa De Indian Health Program, 316 F.3d at 1000. Defendant's viability may not be wholly independent of CIRI and the eleven authorizing tribes. Although defendant receives funding from the IHS, Medicaid, Medicare, and private insurance, Olson avers that defendant receives tangible benefits from being an ISDEAA Tribal organization, such as "higher rates of Medicaid reimbursements[,]" access to preferential federal supply sources, "[r]eceipt of ISDEAA 105(L) lease payments[,]" "Federal Tort Claims Act coverage[,]" and access to certain limited federal employees. Olson Declaration at 5-6, ¶ 10, Docket No. 24. And, Olson avers that these benefits "are necessary for SCF's continued operation as a healthcare provider" and that "[t]his is especially true in Alaska where healthcare costs are much higher and the pool of medical personnel is much smaller than the Lower 48." Id. at 5-6, ¶ 11.

as Indians,' and 'is in virtually every respect a normal commercial ... enterprise, such that its operation free of federal [labor law] is neither profoundly intramural ... nor essential to self-government.'" Pauma, 888 F.3d at 1077 (quoting Coeur d'Alene, 751 F.2d at 1116). Plaintiff argues that much the same could be said of defendant, that it is a business that employs non-Alaska Natives and non-Native Americans as well as Alaska Natives and Native Americans, and that it is like any other non-profit health care provider, such as Providence, in that it provides substantial services to non-Alaska Natives and non-Native Americans and receives a majority of its funding from private insurance companies, Medicare, and Medicaid. Roughly 66 percent of defendant's funding comes from funding sources other than the IHS.[23]

But, defendant is not like any other non-profit health care provider nor is it a commercial tribal enterprise. The Ninth Circuit has found the following to be commercial tribal enterprises to which generally applicable laws do apply: a tribal-owned casino, Pauma, 888 F.3d at 1076-77; for-profit tribal lending entities, CFPB v. Great Plains Lending, LLC, 846 F.3d 1049, 1055 (9th Cir. 2017); a retail smoke shop owned by a tribal member and located within an Indian reservation, Solis v. Matheson, 563 F.3d 425, 434 (9th Cir. 2009); a tribal-owned and operated sawmill, Lumber Indus. Pension Fund v. Warm Springs Forest Products Indus., 939 F.2d 683, 685-86 (9th Cir. 1991); and a tribal-owned farm, Coeur d'Alene, 751 F.2d at 1114. The foregoing entities stand in stark contrast to entities that are

---

[23]Olson Declaration at 3-4, ¶ 7, Docket No. 24.

engaging in self-governance, such as the tribal law enforcement agency in Snyder and the tribal housing authority in Karuk. These entities provided a core government function such as housing and law enforcement, and for that reason, their activities were "appropriate activit[ies] to exempt as intramural." Snyder, 382 F.3d at 895.

Defendant too is providing a core tribal government function, the provision of health care to Alaska Natives and Native Americans. That defendant receives payment from Medicare, Medicaid, and private insurance companies does not mean that the self-governance exception cannot apply to it. The Indian Health Service is "the payor of last resort[.]" 42 C.F.R. § 136.61. Defendant, which is providing the health care services that the IHS would otherwise provide, is legally required to seek payment from other sources first.

Finally, plaintiff complains that defendant never informed him "that he was working under a different wage and hour scheme than he would in any other non-profit business in Alaska."[24] Plaintiff points out that nowhere in defendant's pay policies does defendant give any indication that it was asserting its right to self-governance regarding wage and hour concerns. Plaintiff also points out that in its Code of Conduct given to employees, defendant states that it "is committed to complying with all laws and regulations" and that it "will ensure that SCF complies with all applicable state and federal laws[.]"[25] The Code of

---

[24]Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 5, Docket No. 29.

[25]Code of Conduct and Ethics, Exhibit C at 2, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Docket No. 29.

-16-

Conduct lists a number of federal laws that defendant complies with, including the False Claims Act, the Anti-Kickback Statute, the Physician Self-Referral Law, the Exclusion Authorities, and the Civil Monetary Penalties Law.[26] Plaintiff argues that if defendant believed it was exempt from federal statutes of general applicability, then one would expect that it would have made such an assertion in its Code of Conduct rather than listing federal statutes with which it complies.

But, the self-governance exception does not require that the employer give its employees notice of which federal laws it believes applies to it. But, to the extent that some kind of notice was required, plaintiff was provided with defendant's pay policies from the start of his employment, and those policies clearly stated how he would be paid for his time, including his on-call time. Defendant's Code of Conduct does provide that it complies with all <u>applicable</u> federal laws and it listed some of those laws. But, of import here, the FLSA is not listed and as defendant has shown, the FLSA is not applicable to it, as it "'touches exclusive rights of self-governance in purely intramural matters[.]'" <u>Coeur d'Alene Tribal Farm</u>, 751 F.2d at 1116 (quoting <u>Farris</u>, 624 F.2d at 893).

## Conclusion

The court concludes, as a matter of law, that the FLSA, although a statute of general applicability, does not apply to defendant's employment of plaintiff. Defendant's motion for

---

[26]<u>Id.</u> at 2-3.

summary judgment, which the court has treated as a Rule 12(h)(3) motion to dismiss, is therefore granted.

The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this 15th day of November, 2022.

/s/ H. Russel Holland<br>United States District Judge